UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,              CASE NO. 17-cr-20830

                  Plaintiff,              HON. ROBERT H. CLELAND

v.

D-1 DEONNE DOTSON,

                  Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits this Sentencing

Memorandum regarding defendant Deonne Dotson.  For the reasons that follow,

the United States recommends a sentence at the top of the guideline range

calculated by the probation department: 97 months imprisonment.

## INTRODUCTION

Deonne Dotson was a police officer with the Detroit Police Department who

was convicted of six counts of accepting cash payments in exchange for falsifying

a police report (Count 1) and accepting bribes in exchange for referring abandoned

vehicles to a particular collision shop in the City of Detroit (Counts 2-6), in

violation of federal criminal law and the policies and procedures of the Detroit

Police Department.  For his own financial gain, Dotson broke the law, ignored his

oath as a police officer, and disregarded his professional ethics and obligations.  In doing so, he eroded the trust our community places in the Detroit Police Department.  Moreover, as the proofs at trial demonstrated, Dotson engaged in this criminal conduct eagerly and aggressively and has shown little remorse for, or understanding of, its gravity.  For these reasons, the United States respectfully requests that the Court impose a sentence at the top of the guideline range.

### UNITED STATES SENTENCING GUIDELINE CALCULATIONS

The government agrees with the Probation Department that the following offense characteristics and enhancements are applicable, resulting in an offense level of 28:

> § 2C1.1(a)(1): base offense for extortion…………………………...14
> § 2C1.1(b)(1): more than one bribe…………………………………+2
> § 2C1.1(b)(2)(C)→2B1.1(b)(1)(D): bribes >$40k, <$95k………….+6
> § 2C1.1(b)(3): public official/decision making authority……….......+4
> § 3C1.1: obstruction of justice……………………………………+2

(PSR at ¶¶ 36-48).  When combined with a criminal history category of I, and without credit for acceptance of responsibility, the resulting sentencing range is 78-97 months. (PSR at ¶ 83).

Dotson filed objections to two of these enhancements: (1) the total amount of the bribes involved; and (2) obstruction of justice. Dotson also claimed that he should receive a two-level reduction in his offense level for acceptance of

responsibility.  The government responded to these objections, and they are set forth here for the Court's convenience.

## TOTAL AMOUNT OF BRIBES

The Probation Department correctly and conservatively estimated that the total amount of bribes paid to Dotson by one of the collision shop owners was approximately $84,650 based on the testimony of one of the collision shop owners, who will be referred to as ND.[1] (PSR at ¶¶ 22, 40).   This calculation is supported by the following evidence:

(1) ND estimated that he started giving money to Dotson for referrals and falsified police reports "in 2010 or 2011." (ND Transcript, ECF No. 103, PageID.744).  However, ND also testified that he did not give Dotson money until he became an ABAN officer. (ND Transcript, ECF No. 105, PageID.932). According to the Detroit Police Department, Dotson was assigned to the 11th Precinct (Special Operations) as an Abandoned Vehicle Officer as of January 1, 2012.

(2) ND testified that he paid Dotson $1,000 per referral (ND Transcript, ECF No. 104, PageID.794-795). ND also testified (on re-cross examination) that the

---

[1] References to trial witnesses and victims are by initials only to protect their privacy.

payments to Dotson "started off at a thousand but it kept going up until around 13, 15, 1,600" over a span of time. (ND Transcript, ECF No. 105, PageID.974-975).

(3) ND estimated that he received an average of "three, four, five referrals per month" from Dotson and paid Dotson for "all of them." (ND Transcript, ECF No. 103, PageID.746-747).

(4) Trial exhibits and ND's testimony established that during the period of ND's cooperation and after Dotson knew ND's collision shop was raided (April - September 2014), Dotson received $6,650 for five referrals and one falsified police report (ND Transcript, ECF No. 105, PageID.957-958; Gov. Ex. #101Q, 102S, 103N, 104M, 105Q, and 106U: FBI Receipts for Bribe Money).

The probation officer conservatively relied upon ND's lowest estimate of average referrals (3 per month) and the lowest referral amount ($1,000 per referral). (PSR at ¶ 22). Probation also found the bribery began in January 2012 when Dotson became an Abandoned Vehicle Officer. (*Id.*). Thus, in the 24 months of 2012 and 2013, at 3 referrals per month, Dotson received $72,000 (24 x 3 x $1,000). In January and February of 2014 (before the search warrant was executed at ND's shop), ND would have paid Dotson another $6,000 (2 x 3 x $1,000) for a total of $78,000. Then, during the period of cooperation (April - September 2014), ND paid $6,650 in bribes to Dotson. Accordingly, in total, the PSR estimates Dotson received approximately $84,650.

4

Dotson argues that the government's recordings, which proved only six bribes over six months, undermines ND's estimate of three cars per month in the earlier period. (PSR Addendum at A-10).  However, the fewer payments from April through September of 2014 is readily explainable. Dotson did not deal with ND for over one month after ND's collision shop was raided by local authorities, and Dotson dealt cautiously and carefully with him thereafter. (ND Transcript, ECF No. 103, PageID.747-748; Gov. Ex. #110A: Summary Exhibit of Telephone Contact between Dotson and ND: in 2014, calls dropped from 30 in February to:  0 in March; 7 in April; and 12 in May; in June, the calls increased to 54). Furthermore, Dotson often complained it was very slow on the streets and was having trouble locating cars to refer to ND. *See, e.g.*, Gov. Ex. 101C;101C/T: Recording (Dotson: "Man, I got one car today, man.  An old piece of shit, a Durango"); Gov. Ex. 101D; 101D/T: Recording (Dotson: "Man, I ain't got shit . . . Yeah, it's, it's, it's dead . . . Man, well then they [the west side] must be getting all my damn hookups 'cause I ain't getting' shit"); Gov. Ex. 104H; 104H/T: Recording (Dotson: ". . .it's about time I found something, man.").

Another basis for Dotson's objection to the bribery calculations is his assertion that "the testimony of ND is unreliable and suggests ND may have conflated Dotson with another officer." (PSR Addendum at A-10). But, the jury believed ND's testimony, and there is no basis to conclude that ND "conflated"

5

officers. Ultimately, the Court, having heard the trial testimony, is in the best position to make this determination. And, "[f]or purposes of guideline sentencing, the Court is not bound by the 'beyond the reasonable doubt' standard used at trial.  Information which has not been 'proven' during trial can be considered by the Court for sentencing as long as it meets a preponderance standard." *See* Dotson Presentence Investigation Report, "Instructions to Defense Counsel Guideline Sentencing", pg. 2.

The Probation Department's estimate is conservative for yet another reason: it did not consider or include *any* money Dotson received from Danial Dabish, another collision shop owner who paid Dotson cash bribes for referrals of "numerous" vehicles during  the period of 2013 through early 2015. (Dabish Transcript, ECF No. 106, PageID.1023, 1067).  Dabish testified that he (1) paid Dotson, on average, $1,000 per referral; (2) never got a referral from Dotson that he did not pay for; and (3) paid Dotson more than another officer because "Dotson always wanted more." (Dabish Transcript, ECF No. 106, PageID.1016, 1021, 1023).  Although acquitted conduct may be considered by the Court when calculating the sentencing guidelines and imposing sentence, neither the government nor the Probation Department are requesting that it do so in this case. *See United States v. Watts,* 519 U.S. 148, 154 (1997).

For all of these reasons, the Probation Department's estimate of the total amount of bribes involved in this case is reasonable and supported well beyond a preponderance of the evidence in the trial record.

## OBSTRUCTION OF JUSTICE

USSG § 3C1.1 provides in pertinent part: "[i]f (1) the defendant . . . attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct. . .increase the offense level by 2 levels."  Application Note 4 provides a "non-exhaustive list" of conduct which qualifies for this enhancement, including "(B) committing . . .perjury" and  "(F) providing materially false information to a judge".

During the trial of this case, Dotson offered false and misleading testimony in a variety of areas.  Set forth below are some of the more egregious incidents of Dotson's perjury:[1]

    a.  ECF No. 107, PageID.1098:  Dotson accused the "government" of blocking certain employment when he agreed to the condition of bond restricting employment recommended by Pretrial Services

    b.  ECF No. 107, PageID.1104:  Dotson testified that there was only one "complaint" against him as a police officer and the complaint

---

[1]PageID references are to Dotson's testimony on November 5 (ECF No.107, PageID.1093-1112) and November 6, 2019 (ECF No. 108, PageID.1113-1168).

involved a woman who was upset that he told her to stop vacuuming.  In fact, there had been several very serious administrative and legal complaints against Dotson (PSR at ¶ 78)

c.  ECF No. 108, PageID.1117-1118:  Dotson testified that he was busy cleaning cars off of the streets at the direction of supervisors because of the blight in the city.  However, evidence in the form of his own recorded statements established that Dotson frequently complained to ND that there were no stolen cars around to bring to ND (*See, e.g.*, Gov. Ex. 101C; 101C/T: Recording (Dotson: "Man, I got . . . one car today, man. An old piece of shit, a Durango"); Gov. Ex. 101D; 101D/T : Recording (Dotson: "Man, I ain't got shit . . . Yeah, it's, it's, it's dead . . . Man, well then they [the west side] must be gettin' all my damn hookups 'cause I ain't gettin' shit"); Gov. Ex. 104H; 104H/T: Recording (Dotson: ". . . it's about time I found something man.")

d.  ECF No. 108, PageID.1120:  Dotson claimed that he always attempted to be accurate in his daily logs.  However, as the exhibits proved, he did not document his visits to ND's collision shop to collect money. (Gov. Exs. 102C, 103C, 104G, 106C).

e.  ECF No. 108, PageID.1120:  Dotson's brother testified that there were/are cameras in DPD police vehicles that filmed everything (which is totally false).  While Dotson carefully answered the question about GPS, he failed to disclose to the jury that the camera testimony of his brother was patently false as established by the government's rebuttal witness, John Fennessey.  Fennessey, the Manager of the City of Detroit's Department of Information Technology, testified that no DPD vehicle ever had the capability of filming everything that occurs in a DPD vehicle. Fennessey testimony, ECF No. 133, PageID.1439-1442.

f.  ECF No. 108, PageID.1124:  Dotson admitted that he sent cars and their owners to ND but implied it was out of friendship and failed to admit that he did so because ND was paying him. His perjury on this issue was solidified by his admissions to the Probation Department. (PSR at ¶ 35)

g.  ECF No. 108, PageID.1126-1127:  Dotson testified that there was a "sustained misconduct" in his file regarding the use of force but failed to reveal the $2.5 million civil jury verdict against him. (PSR at ¶ 78)

h.  ECF No. 108, PageID.1129:  Dotson testified that he never pressured anyone to take their car to Somerset when, in truth, he arranged to have cars taken to ND without the owner's consent or acquiescence (ECF No. 119, PageID.1331-1332:  CE testified he was told his car was towed to Somerset; ECF No. 120, Page ID.1349-1351: ML testified Dotson told her and VW that their car was being towed to Somerset despite the fact that VW told him he wanted it towed to the dealer)

i.  ECF No. 108, PageID.1132:  Dotson testified that ND and Dotson referred to Shwarma sandwiches as "birds" (presumably to explain ND's statement that "we gotta talk about some birddogs" and "get that birddog" (cash for referrals) in a taped conversation with Dotson)(Gov. Ex.101D; ND Testimony, ECF No. 104, PageID.786-787)

j.  ECF No. 108, PageID.1135:  Dotson testified it was his partner, Kevin Eaton, who used excessive force against the young man he was attempting to arrest which is contrary to the reports and findings on the matter.  *See* Exhibit A: DPD Excessive Force Memorandum, 6/1/11 (redacted)(attached)

k.  ECF No. 108, PageID.1148:  Dotson testified that he did not let ND inside his patrol car despite being recorded inviting ND to look at the computer in his  patrol car, (Gov. Ex.105K), and telling him on another occasion that he left the doors unlocked and ND could keep them unlocked (Gov. Ex.103-I)(ND left money in Dotson's patrol vehicle on each of these occasions)

l.  ECF No. 108, PageID.1148:  Dotson testified that ND did not put money inside his cup holder in his car (Gov. Ex.105M: photo of $1,600 in cup holder of Dotson's patrol car after Dotson asked ND "you doing 16?" (Gov. Ex.105K)

     m. ECF No. 108, PageID.1161:  Dotson testified that the recorded conversation referencing Dabish had nothing to do with bribes but involved the repair of a car owned by the mother of his son (*See* ND Testimony, ECF No. 104, PageID.817, 831-832)

     n. ECF No. 108, PageID.1162: Dotson testified that the approximately 600 telephone calls with Dabish were about his son's mother's car that Dabish repaired or complaints from citizens about his work and not about referrals for bribes

     o. ECF No. 108, PageID.1164:  In response to a written question from a juror (asked by the Court), Dotson testified that "16" meant the amount of hours ND worked (rather than a $1,600 bribe)(*See* ND Testimony, ECF No. 104, PageID.870-871)

     p. ECF No. 108, PageID.1164-1165:  In response to another written question from a juror (asked by the Court ), Dotson testified that he only left his patrol car unlocked because he did not keep weapons in his car

     q. ECF No. 108, PageID.1165-1166: In response to another written question from a juror (asked by  the Court ), Dotson gave a false and nonsensical answer about why the cars sent to ND were always towed by LIJBS

    Any one of these examples supports the adjustment for Obstruction of Justice. The assessment of this guideline enhancement does not punish Dotson for exercising his constitutional right to testify, as he suggests. Rather, once Dotson made the choice to testify, he is obligated to tell the truth like every other witness. *See, e.g.,* Jury Instruction: Defendant's Testimony or Other Evidence, ECF No. 93, PageID.666 ("If a defendant does testify, his testimony is evaluated as with any other witness."). Furthermore, the basis for the obstruction enhancement is not

erroneous testimony; the enhancement is based upon Dotson's willful false

statements under oath.

## ACCEPTANCE OF RESPONSIBILITY ADJUSTMENT

Dotson insists he is entitled to a two level reduction for acceptance of

responsibility.  Application Note 2 to Section 3E1.1 of the Sentencing Guidelines

states:

> *[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.* Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, *a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.*

USSG § 3E1.1, comment (n.2)(emphasis added). Dotson accepted no responsibility

for his criminal conduct either before or during trial. Indeed, when initially

confronted by the investigating FBI agents, Dotson strenuously and repeatedly

denied accepting any money from ND in exchange for referrals. This interview,

with Dotson's repeated denials, was electronically recorded on November 4, 2016.

11

At trial, Dotson never admitted any wrongdoing and affirmatively lied about inculpatory facts.  In a clear ploy to reduce his sentencing exposure after trial, Dotson told the Probation Department that he accepted responsibility for extortion as to the counts of conviction (PSR ¶ 35) and that he was remorseful and made a mistake. (PSR ¶ 63).  After three years of investigation and repeated rejections to cooperate with the government, these statements, following convictions at trial and false testimony under oath, unquestionably are not a clear demonstration of acceptance of responsibility. By the explicit requirements of Application Note 2, the reduction for acceptance of responsibility is not available to someone who denies guilt at trial, is convicted, and only then admits guilt and expresses remorse.

Furthermore, Dotson clearly did not go to trial "to assert or preserve issues that do not relate to factual guilt." For the first time, Dotson now states he proceeded to trial in order "to expose the nature of the investigation and the use of assets like ND." (PSR Addendum at A-27). This is patently absurd. Dotson was a trained police officer with a plethora of options to report anything he felt was untoward. Dotson could have, *inter alia*, availed himself of the government's many invitations to cooperate in the investigation, filed a complaint with the FBI's Office of Inspector General or other federal or state law enforcement agencies, and/or notified the media. Accordingly, this is not one of the "rare cases" where a defendant accepts responsibility for his criminal conduct while exercising his

constitutional right to a trial. Thus, Dotson is not entitled to a reduction in his

offense level for acceptance of responsibility under USSG § 3E1.1.

## APPLICATION OF 18 U.S.C. § 3553

Title 18, United States Code, Section 3553(a) requires the Court to impose a

sentence that is "sufficient, but not greater than necessary" to comply with the

purposes of sentencing. In order to determine the particular sentence to impose,

this Court must consider the familiar statutory factors listed in § 3553(a)(1)-(7).

An application of the sentencing factors to this defendant justifies a sentence at the

top of the guideline range.

    1.    *Nature and Seriousness of the Offense*

The nature and circumstances of the offense are serious.  Dotson was a

police officer and accepted bribes, disregarding his obligation to uphold the law.

Dotson's actions demonstrated patent disrespect for his duties and responsibilities

as a law enforcement officer.  His criminal activity was not the result of a

spontaneous decision borne out of financial distress; rather, his law breaking was

generated and prolonged by daily and hourly decisions and it was within his sole

power to cease his criminal activity at any point.

In assessing the nature and circumstances of the offense, the Court should

also take into account the violations of trust inherent in Dotson's conduct.  He was

an officer and, as such, the citizens of Detroit relied upon him to advise them

without the influence of self-interest.  Instead, Dotson allowed his advice and

guidance to be fundamentally compromised by the lure of cash.  Any officer who

participates in such a scheme erodes the essential public trust placed in the Detroit

Police Department. A guideline term of incarceration is necessary to reflect the

nature and seriousness of these types of corruption offenses.

2.   *Characteristics of the Defendant*

Dotson was provided the familial support, resources, and virtues necessary

to live a law-abiding life and to understand the consequences of choosing not to do

so. Given his support and education, he could have been an outstanding police

officer. Instead, he chose to employ his skills to enrich himself by serving as a cog

in a scheme that deprived citizens of accurate and reliable information.  Instead of

working legitimately, he made a deliberate choice, not in the heat of passion, but

after careful deliberation.   His willingness to abuse the trust the public placed in

him, in exchange for cash, speaks loudly about his character and integrity and

justifies a sentence at the top of the guideline range.

So, too, Dotson's eagerness and aggressiveness in committing these crimes

should be considered by the Court in formulating its sentence.  These qualities

were evidenced in almost every one of the 33 recordings admitted into evidence at

trial.  Some notable examples of Dotson's eagerness include:

- Dotson's June 4, 2014, statement to ND: "Anything you want, I'll help you." (Gov. Ex 102K)

14

- Dotson's June 4, 2014, statement of near fealty toward ND:

  > ND:  . . . But I'm just gonna tell ya I'm the realest mother fucker out here man, for real.
  > DOTSON: That's why I fuck with you.
  > ND: I'm the realest mother fucker out here. I swear-
  > DOTSON: That's why I fuck with you.
  > ND: That's, that's comin' from the-
  > DOTSON: That's why I fuck with you, man.
  > ND: You know what I'm saying?
  > DOTSON: Alright, man.

  (Gov. Ex. 102M; ND Testimony, ECF No. 104, PageID.818)

- Dotson's July 8, 2014, statements to ND after receiving a bribe of $1,250: "Man, I'm gonna, I will refer the world to you, Dog. You know that," and "Oh man, yeah, yeah, yeah, alright man, you do good work – I will refer a hundred to you, alright?" (Gov. Ex. 103M)

- Dotson's July 8, 2014, conversation with ND counseling ND about how to reduce the amount of bribes to a fellow officer. (Gov. Ex. 103I)

- Dotson's decision in August 2014 to have the vehicles of two car theft victims towed to Somerset Collision without the owners' prior knowledge or consent. (CE testimony, ECF No. 119, PageID.1331-1332; ML testimony, ECF No. 120, PageID.1349-1351)

- Dotson's preference, stated repeatedly, that he would rather talk to the vehicle owners before ND called them:

  o Gov. Ex.102P: ND: "You wanna give me, you got their number? I'll call them myself or what you wanna do? How do you wanna do it?" DOTSON: "Shit, I'd rather talk to them first, man. I mean, if I can't talk to them first then . . .

     o  Gov. Ex. 104K: ND: "Now, wait a minute. Should I call him now or what should I do?" Dotson: "No, wait, wait, hold off. Let me, let me call him first."

- Dotson's September 29, 2014, sales pitch to a car theft victim: "Kelly, I'm, uh, I gotta guy, uh, he, he um, he does the best repairs in the world.  He can, he can get you a rental and everything." (Gov. Ex. 106S).

Even more disturbing are the examples of Dotson's aggression toward ND when ND suggested that Dotson not be paid or wait for payment:

- On July 8, 2014, ND was worried that a car referred by Dotson might be totaled and, therefore, he could not be paid for repairing it.  ND suggested that Dotson wait until that issue was resolved for the bribe payment. Dotson refused.

  ND: The motherfucker might be totaled, you can't trust me for 24 hours?
  DOTSON: Seeing my ribs, man.

  (Gov. Ex.103-I)

- On June 4, 2014, when ND inadvertently shorted Dotson on a referral fee and Dotson discovered it, Dotson called ND and engaged in the following conversation:

  DOTSON: Man, I almost laughed, dog. What the heck? Wh-, what?
  ND: What, what is that?
  DOTSON: (Laughs) What you want me, you want me to holler at you later? What, what's the deal?
  ND: Why, what's wrong?
  DOTSON: Huh?
  ND: What's wrong?
  DOTSON: Hold on.

ND: 'Cause I didn't count, I ain't- What are you talking about, man?

DOTSON: (Laughs)

ND: Oh you know what? I'm sorry. I have the wrong, got the, wait a minute, wait a minute. I apologize. That's the wrong-

DOTSON: Wow, man. Wow.

ND: It was a, I gave it to you from the wrong, listen dude. Listen. I'm sorry, man. I got a whole…Hey, Mark. How you doin'?

DOTSON: Hey, hey, hey. I'll holler at you uh, a little later. I'll, I'll be back.

ND: Hang on Dotson. Hang, you need (Pause) Hey D, D…

DOTSON: What up?

ND: No, okay, I'm sorry. I gave it to you from the wrong, the wrong one. I'm sorry.

DOTSON: Man, hey, hey, we always good, man. Okay, I'll see you a little later.

ND: No, come on back right now and (unintelligible). I'm sorry because I (laughs). That wasn't intentional. Trust me. It wasn't intentional.

DOTSON: Alright, dog. Later.

ND: Come on back. I gotta holler at you. Come on back.

DOTSON: Alright, dog.

ND: Bye.

(Gov. Ex. 102L)

- On September 3, 2014, when discussing the payment for the LaTanya Williams vehicle (Count Six), ND told Dotson he was short on money and suggested that Dotson wait for his payment until ND got paid for the repairs. Dotson expressed his unwillingness in no uncertain terms:

ND: 'Cause I'm, I'm it's tight for me today. It's tight.

DOTSON: *Man, shit, come on, man*.

ND: I mean, you should look out, you should, you should do these residual, you know what residual is?

DOTSON: Uh-

ND: Wait until later.

DOTSON: *No, naw, hell no. Hell no*.

ND: Hell no? Why not? What's the big fucking deal?
DOTSON: *Hell no.*

(Gov. Ex.106N)(emphasis added).

Nothing quite illustrates Dotson's aggressiveness, however, like the recording of his conversation with ND showing his insistence on being paid for a vehicle he did not refer to Somerset Collision. As the Court will recall, the vehicle was taken to Somerset for repair by the true owner's sister after it had been stolen, but before the DPD was notified that it had been found. ND called Dotson to "recover" the car (i.e. change the stolen status of the car in the L.E.I.N. system) when the vehicle arrived at Somerset. After learning that the registered owner of the vehicle was not at Somerset, Dotson realized he would not be able to legitimately recover the vehicle. To recover the car without the true owner's authorization, Dotson would have to falsify the recovery report by stating he had spoken to the owner. The following discussion was recorded:

ND: You know this is my customer, right? I mean, you ain't in this area no more anyway, there ain't no money for you.
DOTSON: You know this ain't, this ain't my run. I could, I, I could, I could leave and you see, you see this cop that's behind me?
ND: Okay, so?
DOTSON: We're two, we both (unintelligible) up in here.
ND: Who is it? I probably know his ass, anyway.
DOTSON: Call him up.
ND: Naw, chill out. Look—
DOTSON: Call him up, look, ah,
                           ***
DOTSON: Yeah, 'cause uh, it ain't in her name. Ain't in her name.

> ND: I know I'm a little tight right now, man. Look out (unintelligible).
> DOTSON: Ain't in her name.
> ND: I'm a little, I'm a little fucked up right now, okay? Ok what, what are you talkin' about?
> DOTSON: Ain't in her name.
> ND: What are you talkin' about?
> DOTSON: (Unintelligible) this shit up. Ain't in her name.
> ND: Okay. (Unintelligible) how we gonna do this, you gonna do maybe five?
> DOTSON: Naw.
> ND: What do you mean no? It's my car. Are you fuckin' serious? Ain't, hold on. (Unintelligible)
> ND: Dude, are you fucking serious, man? Are you serious? Man, come on, tell me what's up?
> DOTSON: Ain't in her name, one. Two, where is he?
> ND: Who the guy? That's her brother. I know dude, (unintelligible) look, this is my car. But if you bring me another cars--

(Gov. Ex.101O). Here, ND repeatedly tells Dotson that he does not have the money to pay him. Dotson simply repeats "ain't in her name" knowing that ND will risk losing the customer if the car is not recovered while it is at his business. And, Dotson's tone of voice is adamant, forceful, and domineering while he is in full uniform and on duty as a Detroit Police Department officer. This conversation, as well as all of the other recordings, provide the Court great insight into Dotson's true character.

Dotson's questionable character is further demonstrated by his failure to acknowledge the seriousness of his illegal activities as a law enforcement officer. His only statement of responsibility was solicited by the reporting probation officer well after his convictions: "It is noted, during the presentence interview . . .

*Dotson was asked if he wished to make a statement regarding acceptance of responsibility*.  At that time, the defendant stated he accepted responsibility for extortion *as to the counts upon which he was convicted*." (emphasis added)(PSR at ¶ 35).  However, Dotson further stated that he was "not a problem guy;" and he did not see "how prison would rehabilitate him." (PSR at ¶ 63).  These are not the words of someone who has come to grips with the gravity of his wrongdoing. Dotson limited his acceptance of responsibility to six payments when the trial proofs demonstrated responsibility for significantly more. And, he has neither acknowledged nor explained his lies to investigating agents and his false and misleading testimony at trial.

Lastly, but significantly, Dotson has a history of the worst kind of abuse of power by a police officer: using excessive force and ignoring the excessive use of force by a fellow officer.  As discussed in paragraph 78 of the PSR, Dotson was involved in two such incidents.  First, in *Jones v. Moore*, et al. Case No. 07-cv-15050 (Hon. Denise Page Hood), a jury returned a verdict against Dotson for $2.5 million based upon the following conduct:  Dotson's "partner, Officer Nzinga Moore, severely beat the plaintiff (Larry Jones) following a traffic stop, during which the plaintiff complied with orders given to him by the officers."  (PSR ¶ 78).  In the lawsuit, Dotson was accused of assisting in the beating.  (PSR ¶ 78). All of the involved officers failed to timely obtain medical care for Mr. Jones and

lied about the events leading to Mr. Jones's injuries.  As a result of Moore's use of force and Dotson's acquiescence, Mr. Jones suffered a subcondylar/left body fracture which required his jaw to be wired shut. (PSR ¶ 78).

Second, according to a thorough Internal Affairs investigation by the Detroit Police Department, in December 2010, Dotson and his partner were attempting to arrest a young male suspected of home invasion. When the young man did not immediately comply with police instructions, Dotson struck the young man in the leg several times with his police department baton. When the victim attempted to avoid the blows to his leg by Dotson, Dotson's next blow hit the victim in the head. (PSR ¶ 78).  When Dotson appealed the "sustained misconduct" finding by DPD Internal Affairs, no formal discipline was imposed.[1]

These two abhorrent and frightening incidents are consistent with Dotson's remarkable disregard for his fellow citizens and the community he took an oath to protect and should be considered by the Court in fashioning an appropriate sentence.

3. _Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment_

Given Dotson's position as an officer at the time of the offense, it is crucial that the Court's sentence addresses the seriousness of breaching the public trust

---

[1] A redacted report of this investigation is attached as Exhibit A to this memorandum.

and also promotes respect for the law. The public should know that the justice system will punish law enforcement officers who break the law and break the public trust.  It has always been an important message, and the significance of the message to the community certainly never diminished during the pandemic. A sentence at the top of the guideline range will send the message that no one is above the law, especially those entrusted to uphold the law.

4.   _Deterrence to Criminal Conduct and Protection of the Community_

Specific deterrence is an important consideration in this case in light of Dotson's reluctance to acknowledge any wrongdoing or remorse for his long-running crimes until his self-serving attempt for acceptance of responsibility points during his interview with the Probation Department.  This Court cannot have any confidence Dotson will cease all criminal behavior when, even after he was caught on tape, Dotson refused to accept responsibility for years and lied to the Court and to a jury.  Sadly, Dotson has demonstrated by his actions and his attitude that the public requires protection from him for a substantial period of time.  While Dotson has complied with his bond conditions while awaiting sentencing, his compliance during a pandemic with the threat of surrender to a BOP facility for any violation does not mean that Dotson's character has changed in any way since his convictions.

A top of the guidelines sentence is also necessary to deter others from engaging in criminal activity of this nature.  The justice system must send the appropriate message to law enforcement officers who are inclined to disregard the laws they are obligated to enforce -- a clear message that the justice system will punish such conduct.

Every day, law enforcement officers face the temptation to abuse their positions of power and the public trust. Law enforcement officers who are inclined in this direction are capable of being deterred and word of significant penalties for such conduct travels quickly and widely within their professional and personal networks.  A custodial sentence within the applicable guideline range would send the message that there are serious consequences for public corruption and, accordingly, should have a significant deterrent effect.  As noted in *United States v. Peppel*, 707 F.3d 627 (6th Cir. 2013), because white-collar crimes are "'more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.'"  *Peppel*, 707 F.3d at 637 (quoting *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)).  And, as aptly stated by a federal court plagued by corruption in its district:

> Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage

in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all --- not only to the average citizen, but to all elected and appointed officials.

*United States v. Spano,* 411 F.Supp.2d 923, 940 (N.D. Ill. 2006).

5. *The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner*

This sentencing factor, as well, justifies a lengthy custodial sentence.

Dotson has identified a need for treatment for a gambling addiction. (PSR at ¶¶ 67, 102). Additionally, Dotson will no longer be employable as a law enforcement officer and will therefore require training in another vocation. A lengthy custodial sentence would allow for further education and vocational training in areas of interest expressed by Dotson to the Probation Department: heating, ventilation, and air conditioning (HVAC). (PSR at ¶¶ 73, 102).

6. *The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Accordingly, the Supreme Court has held that "district courts must begin their analysis with the

24

Guidelines and remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate, and uniform sentencing of criminal offenders. *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

Law enforcement officers with no criminal history and who engage in illegal activity as Dotson did uniformly face the offense penalties applicable here. To sentence Dotson outside of the sentencing guidelines and give him a lesser sentence than those similarly situated across the nation would hardly seem a just result given the nature of his criminal activity and Dotson's failure to appreciate the seriousness of his criminal activity. Moreover, the proofs at trial painted a portrait of a police officer who was (1) eager to engage in this ongoing criminal activity (2) aggressive about receiving his payments, and (3) totally dismissive of the gravity of his conduct.  These factors substantially and significantly distinguish Dotson from the other officers who appeared before this Court in similar cases.

## CONCLUSION

Dotson's conduct was a direct affront to the trust our society places in law enforcement officers. Accordingly, his sentence should reflect the harm his conduct caused as well as the need to deter him and future offenders. A sentence at the top of the guideline range would serve the goals articulated by Congress; such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes of sentencing.  Furthermore, Section 3553(a)(6)

commands that the Court strive to avoid disparity in sentencing which is best

achieved through faithful application of the Guidelines.

Respectfully submitted,

SAIMA MOHSIN
Acting United States Attorney

s/SARAH RESNICK COHEN
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, Michigan 48226
Phone: (313) 226-9637
Email: sarah.cohen@usdoj.gov

s/CRAIG A. WEIER
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, Michigan 48226
Phone: (313) 226-9678
Email:  craig.weier@usdoj.gov

Dated: February 23, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 23, 2021, I electronically filed the

foregoing document with the Clerk of the Court using the ECF system,

which will send notification of such filing to the following:

Sheldon Halpern
Attorney for Deonne Dotson


<u>s/SARAH RESNICK COHEN</u>
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, Michigan 48226
Phone: (313) 226-9637
Email: sarah.cohen@usdoj.gov


Dated:  February 23, 2021